**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 14-cv-22855-GAYLES**

**UNITED STATES OF AMERICA, et al.,**
*ex rel.* **SUSAN BROWN and DAVID STONE,**
**Plaintiffs-Relators,**

**v.**

**BANKUNITED TRUST 2005-1, et al.,**
**Defendants.**

_____/

**<u>ORDER</u>**

**THIS CAUSE** comes before the Court on Defendants' Motion to Dismiss Relators'

Second Amended Complaint [ECF No. 228] (the "Joint Motion"), filed by Defendants BankUnited

Financial Corporation ("BUFC"); BankUnited, N.A. ("BankUnited"); PricewaterhouseCoopers

LLP ("PwC");[1] Wells Fargo Bank, N.A. ("Wells Fargo");[2] Wells Fargo Delaware Trust Company,

N.A. ("Wells Fargo Delaware");[3] U.S. Bank, N.A. ("U.S. Bank");[4] Bank of New York Mellon

Corporation ("BNY Mellon");[5] Wilmington Trust Company;[6] Carrington Mortgage Services, LLC

("Carringon"); JPMorgan Chase & Co. ("JPMorgan"); EMC Mortgage LLC f/k/a EMC Mortgage

---

[1]   Named in the Second Amended Complaint as "Price Waterhouse."

[2]   Including in its capacity as former trustee for a trust preferred security identified in the Second Amended Complaint as Preferred Trust X. Wells Fargo is variously named in the Second Amended Complaint as "Wells Fargo Bank," "Wells Fargo Trustee, Secured Asset Mortgage Investments II, Inc.," and "Wells Fargo Trustee, Mortgage Pass-Through Certificates Series 2005-1."

[3]   Solely in its capacity as former Delaware Trustee under a trust preferred security identified in the Second Amended Complaint as "Preferred Trust X."

[4]   Including in its capacity as former trustee for trust preferred security offerings by BankUnited Financial Corporation identified in the Second Amended Complaint as "USBank Trustee, FLSO Trust Preferred III," "USBank Trustee, FBO Trust Preferred IV," "USBank Trustee, FBO Trust Preferred V," "USBank Trustee, FBO Trust Preferred VI," and "USBank Trustee, FBO Trust Preferred VII."

[5]   Individually and in its alleged capacity as Trustee, Convertible Senior Hi Meds.

[6]   In its capacity as former Trustee under certain trust documents and purportedly named in the Second Amended Complaint as "Wilmington Trust Company, Trust Preferred VII," "Wilmington Trust Company, Trust Preferred VIII," and "Wilmington Trust Company, Trust Preferred IX."

Corporation ("EMC");[7] Structured Asset Mortgage Investments II Inc. ("SAMI II");[8] Humberto L. Lopez; Ramiro A. Ortiz; and Alfred R. Camner, as well as on supplemental motions to dismiss and supplemental memoranda in support of motions to dismiss filed by various Defendants individually.[9] The Court has reviewed the operative Complaint and exhibits attached thereto, the parties' briefs, and the applicable law and is otherwise fully advised in the premises.

The Relators in this case, Susan Brown and David Stone (the "Relators"), bring this *qui tam* action claiming violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729–33, and several state and local false claims acts, arising from alleged fraud and false claims orchestrated by BUFC, its affiliated companies, and the other Defendants. The Defendants have moved to dismiss, arguing, *inter alia*, that the Court lacks subject matter jurisdiction over the federal False Claims Act claims, as they are barred by that Act's public disclosure bar. Because the Court agrees with the Defendants, the Joint Motion to Dismiss shall be granted. Moreover, because the Court declines to exercise supplemental jurisdiction over the state and local false claims act claims, the action shall be dismissed in its entirety.

## I.   BACKGROUND

### A.   *Factual History*

#### 1.   The Failure of BankUnited FSB

BankUnited FSB ("BUFSB") was a Miami-based savings and loan that was originally established as a state-chartered de novo institution (under the name United Savings Association)

---

[7]   Named in the Second Amended Complaint as "Chase Loans, as Trustee, EMC Mortgage Corporation."

[8]   Named in the Second Amended Complaint as "Wells Fargo Trustee, Structured Asset Mortgage Investments II Inc."

[9]   Wilmington Trust Company [ECF Nos. 229 & 231]; Wells Fargo and Wells Fargo Delaware [ECF Nos. 230 & 232]; U.S. Bank [ECF Nos. 233 & 234]; PwC [ECF No. 235]; Clifford A. Zucker, as Plan Administrator of the Chapter 11 plan for BUFC [ECF No. 237]; BankUnited [ECF No. 242]; Carrington [ECF No. 243]; BNY Mellon [ECF No. 245]; JPMorgan, EMC, and SAMI II [ECF No. 247]; Lopez and Ortiz [ECF No. 249]; and Defendant Christiana Trust, a Division of Wilmington Savings Fund Society, FSB, as Trustee for Stanwich Mortgage Loan Trust, Series 2012-19 [ECF No. 265].

in 1984. Compl. Ex. A[10] at 40 (Office of Inspector General, Dep't of Treasury, *Safety and Soundness: Material Loss Review of Bank United, FSB* (2010)) ("OIG Report"). In 2000, the Federal Reserve Bank decided to reduce interest rates for member banks to borrow funds to near-zero percent. Second Am. Compl. ¶ 17. Following the Fed's decision, the banking industry "began to zealously and feverishly originate, securitize, and sell" option adjustable rate mortgage loans ("option ARM"). *Id.* ¶ 18; OIG Report at 40. An option ARM is an adjustable rate mortgage with several possible payment options; these options usually include (1) paying an amount that covers both principal and interest, (2) paying an amount that covers only interest, or (3) paying a minimum amount that does not even cover interest. *What Is an Option or Payment-Option ARM?*, Consumer Fin. Prot. Bureau, http://www.consumerfinance.gov/askcfpb/102/what-is-an-option-or-payment-option-arm.html (last visited Jan. 6, 2017). In the third option, the unpaid interest is added to the principal loan balance—a process otherwise known as negative amortization.

Beginning in 2004, BUFSB heavily increased its emphasis on option ARMs. *See* OIG Report at 40. In 2003, option ARMs had totaled only five percent of BUFSB's assets. *Id.* at 41. By March 2008, option ARMS totaled ***fifty-one percent*** of its assets ($7.3 billion). *Id.* at 42. At their peak, ninety-one percent of BUFSB's option ARMs were negatively amortized—in other words, ninety-one percent of BUFSB's borrowers had elected to make payments that were less than the monthly interest accruing on their loans. *Id.*

As with many banks in the United States during this period of time, these lending practices soon became unsustainable for BUFSB. In December 2007, the federal Office of Thrift Supervision ("OTS"), following an examination of BUFSB, concluded that the level of problem residential loans in BUFSB's portfolio was continuing to increase rapidly, with no indication that it would

---

[10] No exhibits are attached to the Second Amended Complaint; instead, the Relators attached exhibits to the original Complaint and reference those exhibits in the Second Amended Complaint. The parties in their various briefs also refer to those exhibits. The Court, therefore, will consider those exhibits attached to the original Complaint as if they were attached to the Second Amended Complaint for purposes of this Order.

begin to subside. *Id.* at 41.[11]

BUFSB discontinued producing option ARMs in May 2008. *Id.* at 42. Two months later, the OTS expressed concern to BUFC—BUFSB's holding company—about BUFC's ability to continue to service its significant accumulated debt and to successfully access capital markets in light of its significant asset quality issues. *Id.* On July 24, 2008, the OTS issued a memorandum of understanding to BUFC, requiring it to raise a minimum of $400 million. *Id.* at 40, 42. That same day, the OTS also issued a memorandum of understanding to BUFSB requiring it to, *inter alia*, terminate its negative-amortization and reduced-documentation lending programs. *Id.* at 42. The OTS determined that BUFSB was in an unsafe and unsound condition due to the deterioration in its portfolio of nontraditional mortgage loans, the concentration of risk associated with the portfolio, and the resultant need for significant additional capital. *Id.*

On August 4, 2008, OTS officials held a conference call to discuss BUFSB's status and the appropriate supervisory and enforcement response. *Id.* at 42-43. The officials also discussed the willingness of BUFSB's management to infuse capital from BUFC to offset a loss for the quarter ending June 30, 2008. The OTS senior deputy director instructed that the infusion of capital should be backdated to June 30, 2008, and that BUFSB should amend its thrift financial report accordingly. *Id.* at 43. So, on August 11, 2008, BUFC filed Form 8-K with the Securities and Exchange Commission ("SEC"), which included a press release and examination for the quarter ending June 30, 2008. *Id.* The 8-K announced that BUFC "strengthened [BUFSB]'s capital 'through an $80 million capital contribution'"—in essence, reflecting the backdated capital contribution that had been directed by the OTS senior deputy director. *Id.* On August 25, 2008, BUFC filed a Form 10-Q with the SEC for the quarter ending June 30, 2008, which also reflected the backdated

---

[11] The OTS no longer exists. After it was implicated in a backdating scandal, it was merged with the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, and the Consumer Financial Protection Bureau through the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376-2223 (2010).

capital contribution, stating that, effective June 30, 2008, BUFC had contributed $80 million in additional capital to BUFSB. *Id.* at 44.

BUFSB's decline continued rapidly. While in July 2008, BUFSB had met the regulatory standard for a well-capitalized designation (the highest capital classification), by January 30, 2009, when BUFSB filed its thrift financial report for the quarter ending December 31, 2008, it met the standard of "critically undercapitalized"—the lowest capital classification.[12] The OTS sent a prompt corrective action notice regarding BUFSB's critically undercapitalized status to the board of BUFSB on February 10th, requiring that the institution submit a capital restoration plan. *Id.* at 46. That capital restoration plan, submitted February 25th, included an injection of $1 billion in equity capital by March 31, 2009, and was contingent on a loss-sharing agreement with the Federal Deposit Insurance Corporation ("FDIC") or other government agency and the development of an appropriate deal structure. *Id.* The OTS rejected the plan because it relied on a government-assisted open bank transaction. *Id.*

On March 12, 2009, BUFSB notified the Federal National Mortgage Association ("Fannie Mae") that it would voluntarily terminate the mortgage selling and servicing contract between it and Fannie Mae, effective April 1st of that year. *Id.* Fannie Mae withdrew its entire mortgage portfolio from BUFSB, alleged to be in excess of $6 billion in originated book value. Second Am. Compl. ¶ 52.

On April 14, 2009, the OTS issued a directive that included the consent of BUFSB's board to the appointment of a conservator or receiver. OIG Report at 46. On May 21, 2009, the OTS closed BUFSB and appointed the FDIC as receiver. *Id.*

---

[12]   "There are five established capital classifications for insured financial institutions: well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized. PCA [prompt corrective action] restricts the activities of institutions that are not well-capitalized." OIG Report at 16 n.11.

### 2.   The Relators' Allegations

According to the allegations in the Second Amended Complaint, this action has its genesis in foreclosure proceedings brought against the Relators by BUFSB. In mid-2003, the Relators refinanced the first mortgage on their personal residence, located 3207 Barton Road in Pompano Beach, Florida—a house they originally built with the intent to sell—with First Union Bank (a bank that was purchased by Wachovia Bank, which itself was later purchased by Wells Fargo Bank). Second Am. Compl. ¶¶ 14, 37. In February 2004, they refinanced that first mortgage with BUFSB; the new mortgage was an option ARM in the amount of approximately $1.1 million. *Id.* ¶ 15. After the housing market crashed in 2007, the Relators' home became unmarketable. *Id.* ¶ 40. In March 2009, BUFSB initiated foreclosure proceedings against the Relators in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida—just two months before the institution was seized by the OTS. *Id.* ¶¶ 36, 49, 81. The foreclosure court ruled in favor of BUFSB, and, as of the filing of the Second Amended Complaint, the Relators were pursuing an appeal. *Id.* ¶ 81.

The foreclosure litigation spurred the Relators to "conduct personal and private investigations" into allegations of misconduct by BUFSB and its affiliates. *Id.* ¶ 3(a).[13] Through these investigations, the Relators allege that they discovered a multitude of wrongdoings by BUFSB, including origination of wrongful mortgages; income tax evasion; and filing of false information with the SEC, the OTS, the FDIC, and the Office of the Comptroller of the Currency. *Id.* ¶ 3(c). Additionally, they allege that "after being deceived by BankUnited's wholesale mortgage department," *id.* ¶ 137, Stone obtained a mortgage brokerage license and subsequent employment at (the now-defunct) Britestar Financial Service ("Britestar") in Delray Beach, Florida, which they describe as "one of BankUnited's Wholesale Mortgage Brokerage members," *id.* ¶ 5. They allege that in

---

[13]   The Second Amended Complaint contains two paragraphs numbered "3."

the course of that employment, Stone "was able to personally witness how BankUnited and other large banks were wrongfully originating mortgages and engaging in reckless banking conduct." *Id.* ¶ 6.

As a result of their investigations, background knowledge and information, and Stone's employment, the Relators allege that BUFSB, through its wholesale mortgage department and other loan departments

> marketed the origination of loans in an unlawful manner, paid mortgage brokerage fees in an improper manner, condoned false advertising in connection thereto, condoned deceptive sales practices, condoned deceptive bait and switch tactics, condoned overcharging borrowers a higher interest rate than could have been obtained in a traditional mortgage, compensated mortgage brokers based upon productivity, not the underwriting quality of mortgages, compensated mortgage brokers for insertion of prepayment penalties, etc., and engaged in endless, reckless, banking activities.

*Id.* ¶ 113. The Relators also allege that the United States government, as well as state and local governments, financed the purchase of various mortgage-backed securities[14] that used the other Defendants[15] as trustees or servicers, but those governments were "deceived into purchasing" "fraudulent" mortgage-backed securities with missing or forged assignments, or without properly negotiated or endorsed notes. *Id.* ¶¶ 120, 210, 217. Further, they claim that the other Defendants, *inter alia*, "sold assets and failed to legally transfer mortgage pools in accordance with transfer [and] exchange protocol of relevant pooling and services agreements"; "sold billions of dollars of Fannie Mae government insured, guaranteed, originated mortgages, based upon false representa-

---

[14]   "Mortgage-backed securities are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity," otherwise known as a depositor. *Mortgage Backed Securities*, Sec. & Exchange Commission (July 23, 2010), https://www.sec.gov/answers/mortgagesecurities.htm. The depositor conveys the pooled loans to legal trusts set up for the purpose of holding legal title to the loans, and, in exchange, receives certificates that the depositor then sells to an underwriter, which the underwriter then sells to investors—a process known as "securitization." Joint Mot. at 3; *see also Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 25 (2d Cir. 2010).

[15]   The other Defendants, according to the Relators, are (1) trustees that controlled a number of mortgage-backed securitized trusts whose assets consisted solely of pools of residential mortgages in Florida and elsewhere in the United States and were to be acquired from BUFSB, or (2) various "facilitators" of BUFSB who aided and abetted BUFSB's wrongful conduct. Second Am Compl. ¶ 103.

tions, as to the quality of the mortgages sold into securitizations"; "borrowed billions of dollars from the Federal Home Loan [Mortgage] Corporation based upon false financial statements"; and "instituted foreclosure actions using false and fabricated documents." *Id.* ¶ 122.

### B.     *Procedural History*

The Relators filed this *qui tam* action under seal on August 4, 2014 [ECF No. 1]. In the Second Amended Complaint, filed January 21, 2016, they bring twenty-six claims against the Defendants, asserting that the Defendants' wrongful actions violate the federal False Claims Act, 31 U.S.C. § 3729–33, and numerous state and local false claims acts. *See* Second Am. Compl. ¶¶ 233-454. The Relators claim, *inter alia*, that each of the mortgage-backed securities sold by the Defendants to the U.S. Treasury or other government-funded entity violated state and federal law because the Defendants provided manufactured mortgage assignments with false signatures, as well as false representations that they held good title to the mortgage-backed security assets, in furtherance of "an effort to transfer impaired securities to the Treasury." *Id.* ¶ 239. They also claim that, in submitting claims in the sale of mortgage-backed securities to the government or government-funded entity, "each of the Defendants knowingly made, used[,] or caused to be made or used[] false records or statements material to false or fraudulent claims to the Treasury[] or other U.S. government funded entity purchasing mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee." *Id.* ¶ 247.

On May 5, 2015, after receiving a Notice of Election to Decline Intervention on behalf of the United States of America and the States of California, Florida, Illinois, and Minnesota [ECF No. 11], which also indicated that the other states and cities named as parties in the Complaint either declined to intervene or expressed no interest in participating, this Court ordered the Complaint unsealed and served upon the Defendants by the Relators, who now proceed individually pursuant to 31 U.S.C. § 3730(b)(4) [ECF No. 12]. The Relators filed the First Amended Complaint

on November 25, 2015 [ECF No. 137], and the Second Amended Complaint on January 21, 2016 [ECF No. 180].

On March 16, 2016, the Defendants filed a Joint Motion to Dismiss the Second Amended Complaint, pursuant to both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [ECF No. 228]. Several individual Defendants have filed supplemental memoranda and motions to dismiss on various grounds [ECF Nos. 229-235, 237, 242-243, 245, 247, 249 & 265], as permitted by the Court [ECF No. 150]. These motions are now ripe for the Court's review.

## II.   LEGAL STANDARDS

A motion to dismiss for lack of subject matter jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(1) may present either a facial or a factual challenge to the complaint. *See McElmurray v. Consol. Gov't*, 501 F.3d 1244, 1251 (11th Cir. 2007). In a facial challenge, a court is required only to determine if the plaintiff has "sufficiently alleged a basis for subject matter jurisdiction." *Id.* at 1251. Furthermore, "the court must consider the allegations in the plaintiff's complaint as true." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981).[16] By contrast, a factual attack "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings . . . are considered.'" *McElmurray*, 501 F.3d at 1251 (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). Because the attack here is factual

> the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to [a] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Williamson*, 645 F.2d at 412-13 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d

---

[16]   The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit rendered before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

884, 891 (3d Cir. 1977)). Additionally, in a factual attack, the plaintiff bears the burden to prove

facts sufficient to establish subject matter jurisdiction. *See OSI, Inc. v. United States*, 285 F.3d 947,

951 (11th Cir. 2002).

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a claim "must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'"

meaning that it must contain "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-

pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption

of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d

701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin.

Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint

are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817

F.3d 1268, 1270 (11th Cir. 2016). All in all, the question is not whether the claimant "will ulti-

mately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold."

*Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III.   DISCUSSION

### A.   *Federal False Claims Act (Counts I-V)*

The False Claims Act imposes civil liability on any individual (1) who knowingly pre-

sents, or causes to be presented, a false or fraudulent claim for payment to the United States

government; (2) who knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false claim; or (3) who conspires to commit such a violation of the Act.

31 U.S.C. § 3729(a)(1)(A)–(C). Under the Act's *qui tam* enforcement provisions, a private person,

known as a relator, may bring an FCA suit on behalf of the government. *Id.* § 3730(b)(1). A relator

who initiates a meritorious *qui tam* suit receives a percentage of the ultimate damages award, plus attorney's fees and costs. *Id.* § 3730(d).

"The FCA places a number of restrictions on suits by relators." *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 440 (2016). Pertinently, "[t]he paragraph [of the FCA] known as the 'public disclosure bar'" prevents *qui tam* actions if the allegations in question in that action were publicly disclosed. *Id.*; *see also* 31 U.S.C. § 3730(e)(4)(A). The provision containing the public disclosure bar was amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901 (2010), but those amendments do not apply retroactively in cases in which the alleged conduct took place prior to the effective date of the amendments—March 23, 2010. *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 841 F.3d 927, 932 n.1 (11th Cir. 2016); *see also Schindler Elev. Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 n.1 (2011); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010). Because all of the Defendants' alleged conduct in this case took place on or before May 21, 2009, when BUFSB was seized by the OTS and handed over to the FDIC, *see* Second Am. Compl. ¶¶ 58-59, the Court's public disclosure bar analysis must proceed under the law as it existed at that time.

Under the pre-2010 version of the statute, the provision containing the public disclosure bar read:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). The statute "operate[s] as a jurisdictional limitation—the public-disclosure bar, if applicable, divest[s] the district court of subject-matter jurisdiction over the

action." *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013) (citing, *e.g.*, *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 468-69 (2007) (explaining that § 3730(e)(4) is a "jurisdiction-removing provision")). Courts in this Circuit employ "a three-part inquiry to determine if jurisdiction exists" under the public disclosure bar: "(1) have the allegations made by the [relator] been publicly disclosed; (2) if so, is the disclosed information the basis of the [relator]'s suit; (3) if yes, is the [relator] an 'original source' of that information." *Saldivar*, 841 F.3d at 932-33 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)). The Court addresses each prong of this inquiry in turn, bearing in mind that "[a] relator bears the burden of proving that the public disclosure bar does not preclude his FCA action." *United States ex rel. May v. Purdue Pharma L.P.*, 811 F.3d 636, 640 (4th Cir. 2016).

### 1.  Public Disclosure

In deciding whether the allegations or transactions at issue were publicly disclosed, the Court "must consider whether the sources on which the [Relators] rely fall into the statute's enumerated categories of sources that are considered public." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015). The three categories are (1) information disclosed "in a criminal, civil, or administrative hearing"; (2) information disclosed "in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation"; or (3) information disclosed "from the news media." 31 U.S.C. § 3730(e)(4)(A).

In the Second Amended Complaint, the Relators state that the "numerous exhibits obtained by the Relators" and attached to the Second Amended Complaint "speak for themselves and clearly present indisputable facts and evidence of wrongful conduct, which has violated various sections of the U.S. False Claims Act." Second Am. Compl. ¶ 11. These exhibits include the following:

***First,*** Exhibit A is an Audit Report issued by the Treasury Department's Office of Inspector General ("OIG"), which "presents the results of [the OIG's] material loss review of the failure

12

of BankUnited, FSB [], of Coral Gables, Florida, and of the Office of Thrift Supervision's []
supervision of the institution." OIG Report at 1. At least one of the Second Amended Complaint's
allegations relies on the information contained therein. *See* Second Am. Compl. ¶ 43 (stating that
the OIG's "report clearly points out the deficient, negligent, and deceptive relationship between
[BUFSB] and its wholesale mortgage brokers, granting them wide discretion in setting the inter-
est rates in a manner that produced the greatest amount of fees to the broker and the bank, to the
absolute detriment of the borrowers/Relators"). This report is considered publicly disclosed in-
formation. *See Schindler Elevator Corp.*, 563 U.S. at 407-08.

**Second,** Exhibit F is a letter from BUFSB to Fannie Mae regarding "Bank United, FSB's
Voluntary Termination of Mortgage Selling and Servicing Contract with Fannie Mae." Compl.
Ex. F at 1. Several of the Second Amended Complaint's allegations either rely on the information
contained therein or quote it directly. *See, e.g.*, Second Am. Compl. ¶ 53 ("In paragraph 2 of
aforesaid letter, [BUFSB] states that it '[a]cknowledges and agrees that Fannie Mae had valid
and sufficient cause to terminate the Contract with cause as of March 12, 2009. For [BUFSB] to
make an admission against interest in this letter speaks volumes of their collective reckless banking
conduct."). This filing is publicly available through the SEC and is therefore publicly disclosed
information.

**Third,** Exhibit G is a Non-Prosecution Agreement between the SEC and Fannie Mae signed
on December 13 and 15, 2011. Compl. Ex. G. At least one of the Second Amended Complaint's
allegations relies on the information contained therein. *See* Second Am. Comp. ¶ 54 ("Fannie Mae
recently entered into a non prosecution [sic] agreement with the Department of Justice for their
conduct in selling and securitizing mortgages with various lenders such as [BUFSB] . . . ."). This
is information disclosed in an administrative investigation and is thus publicly disclosed.

**Fourth,** Exhibit J is a November 5, 2009, demand letter issued by counsel to the FDIC, as

Receiver for BUFSB, to several named former directors and officers of BUFSB, which demands payment of civil damages "based on the breach of duty, failure to supervise, negligence, and/or gross negligence of the named Directors and Officers in connection with residential loan transactions carried out by [BUFSB]." Compl. Ex. J at 2. Several of the Second Amended Complaint's allegations either rely on the information contained therein or quote it directly. *See* Second Am. Compl. ¶ 80 ("The FDIC's demand letter for damages, by FDIC[']s counsel . . . outlines the Bank's unsafe and unsound business practices, breaches of fiduciary duty, negligence, and[/]or grossly negligent acts"), ¶ 207 ("The FDIC sent in a demand letter, [sic] to the Bank Directors & Corporate Officers [sic] errors and insurance carriers. The FDIC knew and clearly identified wrongful conduct which has occasioned huge financial false claim losses to the U.S.A. and its citizens."); *see also* ¶¶ 80(a)–(o), 207(a)–(q). The electronically produced ECF banner appearing at the top of each page of this letter clearly indicates that this document was previously produced in a civil hearing—namely, the Court discovered, in BUFC's bankruptcy proceedings. *See* Motion of the Federal Deposit Insurance Corporation to Enforce the Order Granting, as Modified, Committee's Motion for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers, Directors and Prepetition Professionals, at Exhibit 2, *In re BankUnited Fin. Corp.*, No. 09-19940 (Bankr. S.D. Fla. Nov. 24, 2009), ECF No. 373-2. "[D]ocuments filed with the court . . . are public disclosures under the FCA as part of a 'civil hearing.'" *McElmurray*, 501 F.3d at 1252.

   ***Fifth,*** Exhibit P is an adversary complaint also filed in BUFC's bankruptcy proceedings. *See* Compl. Ex. P; Complaint for Recovery of Damages, *Official Comm. of Unsecured Creditors of BankUnited Fin. Corp. v. Camner* (*In re BankUnited Fin Corp.*), No. 09-19940 (Bankr. S.D. Fla. Dec. 5, 2011), ECF No. 985. At least one of the Second Amended Complaint's allegations relies on the information contained therein. *See* Second Am. Compl. ¶ 97 ("Following the sale of the promissory note portfolio by the FDIC to BankUnited N.A., the FDIC was sued by the unsecured

creditors committee (which included many of the defendants named herein) for wrongful transfer of assets in the U.S. Bankruptcy Court in the Southern District of Florida."). This court document is a public disclosure. *See McElmurray*, 501 F.3d at 1252.

 **Sixth,** Exhibit Q is a stipulation and agreement of settlement filed in the BankUnited securities litigation. *See* Compl. Ex. Q; Stipulation and Agreement of Settlement, *In re BankUnited Sec. Litig.*, No. 08-22572 (S.D. Fla. Sept. 30, 2011), ECF No. 128-1. Several of the Second Amended Complaint's allegations rely on the information contained therein. *See* Second Am. Compl. ¶¶ 98-99 ("[D]espite the FDIC having a priority claim in bankruptcy court far in excess of available assets for distribution, the FDIC settled this lawsuit for hundreds of millions of dollars and a copy of the recorded settlement agreement has been filed in the U.S. Federal Bankruptcy Court . . . . Implicit in this settlement is the fact that BankUnited originated mortgages were sold based upon false representations of all parties involved therein. False financial statements were clearly used in connection with these sales. All defendants/facilitators were engaged in this conduct, directly or indirectly."). This court document is a public disclosure. *See McElmurray*, 501 F.3d at 1252.

 **And seventh,** Exhibit R is a complaint filed in this District against BUFC. *See* Compl. Ex. R; Complaint for Violation of the Federal Securities Laws, *Waterford Twp. Gen. Employees Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-22572 (S.D. Fla. Sept. 17, 2008), ECF No. 1. At least one of the Second Amended Complaint's allegations rely on the information contained therein. *See* Second Am. Compl. ¶ 100 ("On or about September 16, 2008, [BUFC] was sued by Waterford Township General Employees Retirement System for[,] among other claims, security fraud violations, false representations, etc."). This court document is a public disclosure. *See McElmurray*, 501 F.3d at 1252.

 Additionally, the Relators state that they obtained information through "requests [] made under the Fair Debt Collection Practices Act," "requests [] made under the Truth in Lending Act,"

and "requests [] made under the Freedom of Information Act," as well as "personal legal discovery requests." *Id.* ¶ 10. "A written agency response to a Freedom of Information Act request falls within the [FCA's] ordinary meaning of 'report,'" *Schindler Elevator Corp.*, 563 U.S. at 410-11, and thus any information the Relators received as a result of those requests which gives rise to the allegations in the Second Amended Complaint is considered publicly disclosed information. And to the extent the Relators received information via discovery requests, materials disclosed through discovery also qualify as public disclosures under the FCA. *McElmurray*, 501 F.3d at 1253.

The Realtors also admit that they obtained "wrongfully endorsed notes from over 11 foreclosures." *Id.* ¶ 3(g). These court documents, whether filed in state or federal court, are public disclosures. *See McElmurray*, 501 F.3d at 1252; *see also Osheroff*, 776 F.3d at 813.

Finally, and most egregiously, the Relators' Second Amended Complaint contains paraphrased or verbatim recitations of over 190 paragraphs of a complaint filed in a False Claims Act suit in the U.S. District Court for the District of South Carolina. *See* Consol. Third Am. Compl., *United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 10-1465 (D.S.C. Feb. 3, 2014), ECF No. 256; *see also* Joint Mot. Ex. 6 (Defendants' side-by-side comparison of the allegations contained in the *Szymoniak* third amended complaint with the Relators' corresponding allegations in their Second Amended Complaint). Not only are these lifted paragraphs considered public disclosures, but also, notably, the South Carolina district court dismissed the complaint from which those paragraphs were lifted because it ran afoul of the public disclosure bar. *See United States ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 10-1465, 2014 WL 1910845 (D.S.C. May 12, 2014).

Based on the above, the Court finds that the Second Amended Complaint includes allegations that have been publicly disclosed.

### 2.      Basis of the Relators' Suit

In the second step of this inquiry, the Court must determine whether the disclosed information forms the basis of the Relators' suit. "[T]he language of the FCA 'is most naturally read to preclude suits based in *any part* on publicly disclosed information." *Saldivar*, 841 F.3d at 934 (quoting *Cooper*, 19 F.3d at 567). Indeed, "this second prong of the inquiry is a 'quick trigger to get to the more exacting original source inquiry.'" *Id.* (quoting *Cooper*, 19 F.3d at 567); *see also Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006) ("[A] plaintiff basing an FCA qui tam claim in any part on such publicly disclosed information must demonstrate that the plaintiff is an original source of that information."); *accord United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 351 (4th Cir. 2009) ("Section 3730(e)(4)(A)'s public disclosure jurisdictional bar encompasses actions even partly based upon prior public disclosures.").

In their Motion, the Defendants argue that the Second Amended Complaint references government audit reports, publicly available filings with government agencies, and court documents, which all qualify as public disclosures. Joint Mot. at 11. The Relators acknowledge this, but they respond that "not one of the documents point[s] to a direct fraudulent scheme involving Defendants and BU[FSB] to defraud the United States government" and that "[a]t most, what these articles provide are bits and pieces to different instances of wrong doing [sic] from Defendants, but they lack any logical connection to Relators' claim." Relators' Opp'n at 12. Additionally, they argue that the "specific allegation of fraud as to BU[FBS]," namely, that BUFBS and BUFC "created an illusion and appearance of financial stability for many years prior to its bankruptcy filing[,] . . . has never been publicly disclosed." *Id.* at 11. To that end, the Relators rely on a decision from the D.C. Circuit, *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36 (D.C. Cir. 2014), in which that court recounted its own prior interpretation of the public disclosure bar, that "Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud [] or the critical

elements of the fraudulent transactions themselves [] were in the public domain," such that "where only one element of the fraudulent transaction is in the public domain [], the qui tam plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud [] or allegations of fraud itself." *Id.* at 40-41 (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654-55 (D.C. Cir. 1994)). Based on this language in *Oliver*, the Relators contend that they may "mount a claim" by "coming forward with the allegations of fraud" that have heretofore never been alleged. Relators' Opp'n at 11.

The Relators' reliance on *Oliver* (and the underlying *Springfield Terminal*) in this instance is misplaced. The Eleventh Circuit more broadly interprets the term "public disclosure" than does the D.C. Circuit. In *Osheroff*, a decision which post-dates *Oliver*, the Eleventh Circuit reaffirmed that a relator "basing an FCA qui tam claim ***in any*** part on . . . publicly disclosed ***information*** must demonstrate that the [relator] is the original source of that information." 776 F.3d at 814 (second emphasis added). And in *Cooper*, the decision which first established the three-part standard in this Circuit governing the public disclosure bar, the court explained that "[a] court reaches the original source question only if it finds the plaintiff's suit is based on ***information*** publically disclosed." 19 F.3d at 565 (emphasis added). The standard does not require each source to contain an allegation of wrongdoing. "Indeed, § 3730(e)(4) itself requires only disclosures of 'allegations or ***transactions***,' suggesting that allegations of wrongdoing are not required." *Osheroff*, 776 F.3d at 814 (emphasis added). So "[t]hat the disclosed transactions themselves may not have pointed directly to any wrongdoing is simply of no moment." *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1245 (9th Cir. 2000).

The Relators' attempted appeal to the fact that "the federal government filed eighteen [] separate complaints against eighteen [] different financial institutions, and the great majority of the allegations raised in such complaints were identical," Relators' Opp'n to Joint Mot. at 13, is

unavailing. As the Supreme Court recently explained, "[t]he FCA places a number of restrictions on suits by **relators**," including the public disclosure bar. *Rigsby*, 137 S. Ct. at 440 (emphasis added). This restriction does not apply to FCA suits filed by the government. *See* 31 U.S.C. § 3730(3)(4)(A) (2006) ("No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . **unless the action is brought by the Attorney General** or the person bringing the action is an original source of the information." (emphasis added)).

At bottom, a "significant overlap between [a plaintiff]'s allegations and the public disclosures is sufficient to show that the disclosed information forms the basis of th[e] lawsuit." *Osheroff*, 776 F.3d at 814. There is a significant overlap here, given (1) the exhibits discussed *supra*; (2) the nearly two hundred paragraphs taken from a complaint filed in another litigation; (3) other publicly disclosed information; and (4) the Relators' explicit and admitted reliance on (1), (2), and (3) in drafting their allegations. *See, e.g.*, Second Am. Compl. ¶ 10 ("The facts and evidence collected led to the Relators' discovery of the systemic and pandemic fraud that has been perpetrated by all of the Defendants."). Based thereon, the Court easily finds that the publicly disclosed information forms the basis of the Relators' suit.

### 3.    "Original Source"

"The third prong of the inquiry is whether [the Relators are] an 'original source,' allowing for jurisdiction to exist even when the information has been disclosed." *Saldivar*, 841 F.3d at 934. An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B) (2006). The Tenth Circuit's explication of the prerequisites for a finding of original source status, cited with approval by the Eleventh Circuit in *Saldivar*, is particularly instructive:

Knowledge is "direct and independent" if it is "marked by [the] absence of an intervening agency" and "unmediated by anything but [the relator's] own efforts." *United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1547 (10th Cir. 1996) (alterations in original) (internal quotation marks omitted). "To establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof. *United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999). Second-hand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge. *Id.* at 1162-63. "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 688 (D.C. Cir. 1997), *overruled on other grounds by Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007), *as recognized in United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012). The fact that a relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991)).

*Grynberg ex rel. United States v. Pac. Gas & Elec. Co.* (*In re Nat. Gas Royalties Qui Tam Litig.*), 562 F.3d 1032, 1045 (10th Cir. 2009) (citations altered). "[A] plaintiff need not establish herself as *the* original source of the publicly disclosed information but must establish that she is *an* original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim." *Battle*, 468 F.3d at 762 (emphasis in original) (citation omitted).

The Relators' advance several contentions in support of the argument that they qualify as original sources. The Court finds none of them persuasive.

First, they assert that they "clearly have direct and independent knowledge of the information on which the allegation[s] are based," Relators' Opp'n to Joint Mot. at 14, but they fail to support this conclusory assertion. Looking to the allegations of the Second Amended Complaint, the Relators detail their extensive background knowledge and experience. Brown alleges that she is a former employee of Merrill Lynch who "has held numerous security[/]commodity broker

licenses," has been "responsible for due diligence on securities transactions," "has an extensive background on 'backroom' protocol," who "personally spent more than 200 hours researching BankUnited's securities filings in the United States and in England's stock exchanges." Second Am. Compl. ¶ 7. Stone alleges that he is a former IRS agent, CPA, and tax lawyer, who "has extensive accounting and investigative skills and experiences." *Id.* ¶ 137. But this type of self-described "background knowledge," which may enable a relator to understand the significance of publicly disclosed information, does not mean that the relator had knowledge independent of the publicly disclosed information upon which his or her suit is based to qualify them as an original source. *McElmurray*, 501 F.3d at 1254; *see also Osheroff*, 776 F.3d at 815 (stating that "background information that helps one understand or contextualize a public disclosure is insufficient to grant original source status" under the pre-2010 version of the FCA); *Stinson, Lyons, Gerlin & Bustamante,* 944 F.2d at 1160 ("[T]he relator must possess substantive information about the particular fraud, rather than merely background information . . . ."). Furthermore, "[k]nowledge that is based on research into public records, review of publicly disclosed materials, or some combination of these techniques," such as the research and review the Relators allege to have engaged in here, also does not suffice. *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 59 (1st Cir. 2009).

Second, the Relators contend that they personally investigated, researched, and assembled information that "established evidence of systemic and pandemic violations of the origination of mortgages and related actions." Second Am. Compl. ¶¶ 3(e)–(g). As outlined above, however, the Relators' Complaint is littered with public disclosures and publicly available information. A relator's personal investigation and research into public information that is "available to anyone who wished to use it for the same purpose" does not qualify the relator as an original source. *United States ex rel. Lewis v. Walker*, 438 F. App'x 885, 888 (11th Cir. 2011) (per curiam); *see also Saldivar*, 841 F.3d at 836 ("[T]o hold that merely reading a company's quarterly reports grants direct knowledge

to the underlying activity would be to create a large aperture, rendering the word 'direct' in the statute near meaningless.").

Third, the Relators allege that "as a result of being involved in litigation, [they] were privy to nonpublic information" Second Am. Compl. ¶ 3(j), yet they provide no substantiation as to what this nonpublic information is, where it came from, or what bearing—if any—it has on their claims. In *United States ex rel. Brickman v. Business Loan Express, LLC*, No. 05-3147, 2007 WL 4553474, at *8 (N.D. Ga. Dec. 18, 2007), the relators claimed that they "reviewed nonpublic internal corporate documents . . . as part of their investigation into defendants' fraud." In concluding that the relators had not met their burden to show that they were original sources, the court found that they "d[id] not identify any facts that they obtained from the review of nonpublic material." *Id.* Such is the case here. The Court will not consider the Relators original sources based on a single, unsupported allegation that they "were privy to nonpublic information." Second Am. Compl. ¶ 3(j); *see also United States ex rel. Keeler v. Eisai, Inc.*, No. 09-22302, 2013 WL 12049080, at *16 (S.D. Fla. Feb. 1, 2013) ("[A] relator cannot segue into discovery simply by filing prolix but unsubstantiated claims."), *aff'd*, 568 F. App'x 783 (11th Cir. 2014) (per curiam).

Fourth, the Relators allege that Stone obtained information as a result of his employment with Britestar Financial Services. Specifically, he contends that he

> learned of the improper underwriting in the origination of mortgages, cooperation of BankUnited Account Wholesale Mortgage Department, various mortgage origination irregularities, destruction of tax records, unverified stated income applications, fees paid to mortgage brokers for inserting prepayment penalties, non-businesslike mortgage qualification exceptions granted by BankUnited to fund a loan, and improper conduct associated with the origination of mortgages by Bank-United . . . .

Second Am. Compl. ¶ 137. As provided above, "[t]o establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged

22

in the complaint and support those allegations with competent proof." *Grynberg*, 562 F.3d at 1045 (quoting *Hafter D.O.*, 190 F.3d at 1162). None of the allegations relating to Stone's employment with Britestar contains specific facts. They do not describe how or when he obtained any alleged direct or independent knowledge of the Defendants' fraudulent acts; rather, they simply conclude that he obtained such knowledge. Moreover, it is undisputed that Relator Stone was ***not*** an employee of BUFBS or any of the other Defendants, but rather a nonparty mortgage broker. Thus, the allegations the Relators provide vis-à-vis the information Stone "learned of" over the course of this employment, Second Am. Compl. ¶ 137, amounts to nothing more than secondhand information, which the Eleventh Circuit recently held is insufficient to grant original source status. *See Saldivar*, 841 F.3d 936 (adopting the reasoning of several circuit courts' decisions to this effect). In *Saldivar*, the court explained that "[t]he phrase 'direct and independent' is most naturally read as creating an extreme limit on secondhand knowledge that is sufficient to qualify as an 'original source.'" *Id.* As a result, "[b]eing told what another department is doing is almost necessarily not direct knowledge of that department's behavior." *Id.* Extending that reasoning to this context, if being told what another department within the ***same company*** is doing does not qualify as direct knowledge of that department's behavior, then learning what ***another company*** is doing similarly fails to qualify. The Court finds that Stone's allegation that he somehow "learned" of the Defendants' conduct through his employment with Britestar is not direct knowledge of the Defendants' conduct. The Court also refuses to accept the Relators' conclusion, with nothing more, that because Stone was employed by Britestar, he was "an indirect employee, and[/]or agent, of defendant, Bank-United," Second Am. Compl. ¶ 39, which somehow grants him original source status.

Finally, the Relators argue that they are the original sources "of the information which forms the basis of this qui tam action, namely, that defendants conspired to present a picture to the federal government of a solvent BU[FSB, w]hen, in fact, the bank was clearly not financially

stable." Relators' Opp'n to Joint Mot. at 14-15. At the outset, the Court finds this argument hard to believe when the Relators have attached an exhibit to their Complaint that makes a similar assertion about BUFSB. Specifically, in the OIG Report, the Office of Inspector General explained how the OTS "inappropriately[] instructed" BUFSB to revise its Thrift Financial Report, dated June 30, 2008, "to reflect [a] backdated capital infusion." OIG Report at 17. The OIG also noted that although BUFSB "appeared to have met the regulatory minimum requirement of well-capitalized as of June 30, 2008," it "was only *adequately* capitalized, not well-capitalized, at June 30, 2008," and "[b]y reporting its financial condition the way it did, [BUFSB] delayed [prompt corrective action]." *Id.* at 18 (emphasis added). Furthermore, the Relators, in making this conclusion, are essentially claiming that they are original sources because they "put the puzzle pieces together," so to speak, and "discovered," based on their assembling of information, that the Defendants' alleged conduct violated the False Claims Act. As the Defendants correctly point out in their brief, the South Carolina federal court in *Szymoniak* (the case whose complaint's allegations the Relators overwhelmingly adopted) rejected this exact argument:

> Relator's actual contribution is a legal theory of how false claims were submitted to the government, due to Defendants' questionable conduct. . . . The court finds that legal theories—"the very connecting the dots"—are not "knowledge of the information on which the allegations are based." An individual is considered an original source if she has direct and independent knowledge of the underlying *facts* that give rise to the complaint. . . . Indeed, the court believes it to generally be the province of lawyers and courts to create legal theories from a certain set of facts, not the province of *qui tam* relators.

*Szymoniak*, 2014 WL 1910845, at *4-5; *see also A-1 Ambulance Service*, 202 F.3d at 1245 ("The mere fact that [a relator]'s own expertise . . . enabled it to formulate its novel legal theory of fraud is irrelevant to the question of whether the material transactions giving rise to the alleged fraud were already disclosed in the public domain in the first place."). This Court finds the *Szymoniak* court's analysis on this point persuasive. It will not deem the Relators original sources merely

because they may be the first to make these particular claims of fraud against these particular Defendants when it is evident that they do not possess direct and independent knowledge of the facts underlying those claims. In sum, the Court concludes that the Relators are not the "original source" of the information upon which their federal False Claims Act claims are based.

Because the Relators have failed to meet their burden to establish that the public disclosure bar does not preclude their claims, their federal claims are therefore barred. Accordingly, the motion to dismiss Counts I-V of the Second Amended Complaint is granted.

**B.**     *State and Local False Claims Acts (Counts VI-XXVI)*

What remains are the Relators' claims brought pursuant to state and local false claims acts. "The doctrine of supplemental jurisdiction . . . permits 'federal courts to decide certain state-law claims involved in cases raising federal questions' when doing so would promote judicial economy and procedural convenience." *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 530 (11th Cir. 2015) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 348-49 (1988)). This doctrine, codified at 28 U.S.C. § 1367, "grants federal courts the power to exercise jurisdiction over claims 'that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" *Id.* at 531 (quoting 28 U.S.C. § 1367(a)). While Section 1367 "mandates that district courts—at least initially—exercise jurisdiction over those supplemental claims that satisfy the case or controversy requirement," *id.*, district courts have the authority to dismiss state law claims if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction," 28 U.S.C. § 1367(c). *See also Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) ("Any one of the section 1367(c) factors is sufficient to give

the district court discretion to dismiss a case's supplemental state law claims.").

Because the Court has dismissed the federal False Claims Act claims, it declines to exercise jurisdiction over the Relators' state law and local law claims, pursuant to Section 1367(c)(3). "The Eleventh Circuit has a stated policy in favor of dismissing state law claims under these circumstances." *Clarke v. Two Is. Dev. Corp.*, No. 15-21954, 2016 WL 659580, at *2 (S.D. Fla. Feb. 18, 2016); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (citations omitted)); *accord Cohill*, 484 U.S. at 351 ("When the single federal law claim in the action [is] eliminated at an early stage of the litigation, the district court [has] a powerful reason to choose not to continue to exercise jurisdiction."); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). Accordingly, the motion to dismiss Counts VI-XXVI of the Second Amended Complaint is granted.[17]

## IV.    CONCLUSION

Generally, "[a] dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered ***without prejudice***." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (emphasis added). That said, the Eleventh Circuit has affirmed the dismissal of a plaintiff's complaint ***with prejudice*** where it agreed with the district court that the plaintiff could not overcome the public disclosure bar. *See Osheroff*, 776 F.3d at 816.

---

[17]   Given that the Court's above analysis is dispositive of all of the Relators' claims, it need not address any of the arguments raised in the supplemental motions and memoranda.

It is, therefore, **ORDERED AND ADJUDGED** as follows:

(1)    the Defendants' Joint Motion to Dismiss Relators' Second Amended Complaint [ECF No. 228] is **GRANTED**. Counts I-V of the Second Amended Complaint [ECF No. 180] are **DISMISSED WITH PREJUDICE**. Counts VI-XXVI of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE**; and

(2)    the various Defendants' supplemental motions to dismiss and supplemental memoranda in support of motions to dismiss [ECF Nos. 229-235, 237, 242-243, 245, 247, 249 & 265] are **DENIED AS MOOT**.

This action is **CLOSED** and all other pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of January, 2017.

_____

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE